IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

EDWARD L. MCNEIL,

    Plaintiff,

      v.               CIVIL NO.: WDQ-13-1473

LOYOLA UNIVERSITY, *et al.*,

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Edward L. McNeil, *pro se*, sued Timothy Fox and Jocelyn Z. Kelley (together, the "individual defendants"), and Loyola University ("Loyola"), for employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")[1] and the Age Discrimination in Employment Act of 1967 ("ADEA").[2] ECF No. 1. Pending are the defendants' motion to dismiss for failure to state a claim and McNeil's motion for leave to file a surreply. ECF Nos. 5, 12. No hearing is necessary. Local Rule 105.6 (D. Md. 2011). For the following reasons, the defendants' motion will be granted, and McNeil's motion will be denied.

---

[1] 42 U.S.C. §§ 2000e *et seq.*

[2] 29 U.S.C. §§ 621 *et seq.*

I. Background[3]

McNeil, an African-American[4] male born in 1946, worked for
Loyola's Department of Public Safety ("DPS") in Baltimore,
Maryland as a police officer with managerial and supervisory
authority. *See* ECF Nos. 1 at 1-2, 4, 7; 5-1 at 2. From 2002
through 2009, McNeil reported to Fox, Director of DPS, after
which he reported to Kelley, a white woman. *See* ECF No. 1 at 6,
8. Fox would "occasionally talk about [McNeil's] age, and ask
[him] when [he] was going to retire." *Id*. at 10.

---

[3] For the motion to dismiss for failure to state a claim, the
well-pled allegations in the complaint are accepted as true.
*See Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011).
In reviewing the motion to dismiss, the Court may consider
allegations in the complaint, matters of public record, and
documents attached to the motion to dismiss that are integral to
the complaint and authentic. *See Philips v. Pitt Cnty. Mem'l
Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Because McNeil is
proceeding *pro se*, the Court will also consider the factual
allegations in McNeil's opposition to the motion to dismiss to
the extent they are consistent with the complaint. *See, e.g.,
Rush v. Am. Home Mortgage, Inc.*, CIV.A WMN07CV0854, 2009 WL
4728971, at *3 (D. Md. Dec. 3, 2009); *see also Erickson v.
Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d
1081 (2007) ("A document filed *pro se* is to be liberally
construed, and a *pro se* complaint, however inartfully pleaded,
must be held to less stringent standards than formal pleadings
drafted by lawyers." (internal quotations and citations
omitted)).

[4] McNeil has not expressly identified his race. His opposition
notes that before Mr. Fox entered the department "the staff was
at least 85% African American," and then it "gradually
transformed to at least 75% Caucasian with all administrative
positions." *See* ECF No. 9 at 9. Also, McNeil checked the
"race" box on his complaint to indicate that he was alleging
racial discrimination. *See* ECF No. 1 at 2. From these
allegations, the Court infers that McNeil is African-American.

2

From 2003 until the end of his employment with DPS in 2012, Fox and Kelley subjected McNeil to "continual and consistent . . . harassment," including "stripping [McNeil's] authority" and "demeaning [his] reputation," because Fox wanted to "get rid of" McNeil. *Id.* at 8. For example, "[on] one occasion," Fox approved a decision to promote a base dispatch officer that was made without McNeil's input. *Id.* at 4. McNeil protested because a less qualified officer was promoted over a more qualified one, and he succeeded in obtaining the promotion for the more qualified officer. *Id.* On another occasion, Fox struck McNeil "viciously" on the back in front of other employees and third-party vendors "as he walked past" McNeil to a meeting.[5] ECF No. 9 at 1.

In 2003, Fox told McNeil that several officers had reported to him problems during the 4:00pm to 12:00am and 12:00am to 8:00am shifts, rather than reporting those problems to McNeil. *See* ECF No. 1 at 3. Although McNeil worked only the 8:00am to 4:00pm shift, he had supervised all three shifts "for years" before Fox became Director of DPS. *See id.* Fox told McNeil that he could no longer supervise all three shifts, even though, by reporting problems to Fox instead of McNeil, the base

---

[5] This event occurred sometime during the years 2003-2005, but McNeil does not specify the exact date. *See* ECF No. 9 at 1.

3

operators were "fail[ing] to perform their duties in [McNeil's] absence." *See id.*

Also in 2003, Fox told McNeil he would not receive a raise for several years, because McNeil made more money than Robert Calendar, a white male, even though Calendar ranked below McNeil and was less tenured. *See id.* at 4. McNeil's salary freeze "was not because of [his] performance," but resulted from Fox's "plan against [him] to elevate the white employees, both in stature and salary and to continue the process of fracturing [McNeil's] reputation and curtail[ing] any comparable salary increases for [him] so that others could surpass [his] salary." *Id.* Fox also told McNeil in his 2003 and 2004 evaluations that McNeil was the highest paid officer in DPS and that Fox "was going to do something about that." *See id.* at 4-5.

In 2004, Fox "mandated that the supervisors were to be trained by [McNeil] on base operations" and that the supervisors would complete base officer evaluations, with input from McNeil and "other managers and administrators." *Id.* at 9. Instead, McNeil had to complete the evaluations, because "none of the police administrators knew the base officers['] job." *Id.* McNeil complained to Fox that the "Shift Commanders were recalcitrant and disrespectful" towards McNeil and failed to cooperate with him. *See id.* Fox did not address the problem through discipline or otherwise, which "effectively stripped

4

[McNeil] of [his] supervisory authority over the base dispatch officers." *See id.* at 4, 9. No other person in DPS "had to deal with a situation like this" or "share administrator responsibilities with other members in the department." *See id.* at 4, 9. Also, McNeil's "Caucasian counterparts were given preferential treatment in everything from raises to training."[6] *Id.* at 4.

In 2005, McNeil "recommended that a young male Caucasian, Michael Mendez," a probationary employee, "be terminated for being untrustworthy." *Id.* at 8. Mendez had lied about his phone number and place of residence, and about why he failed to attend scheduled training. *See id.* Fox decided that Mendez should not be fired or disciplined. *See id.* at 9. This incident "added to [McNeil's] stress and a continual degradation of any semblance of authority from [his] position." *Id.*

Also in 2005, McNeil learned that Earl Eagan, a white male, made more money than McNeil, even though McNeil ranked higher, had more responsibility, and had worked at DPS 15 years longer. *See id.* at 5. McNeil complained to Human Resources ("HR") but "[n]othing was done." *Id.*

Also in 2005, McNeil met and emailed with Terri Davis, an African-American HR employee, several times to discuss "racial

---

[6] McNeil alleges that "[t]raining was lacking for everyone . . . for years except [Kelley and Patrick Weber, a white male]." ECF No. 1 at 4, 7.

5

discrimination" in DPS "and the unfair labor practices" in DPS "pertaining to [McNeil]." *See id.* at 5. "Davis never investigated any of [McNeil's] allegations." *Id.* McNeil soon realized that Fox knew about McNeil's meetings with Davis and about McNeil's complaints. *See id.* As a result, in August 2006, McNeil decided to stop meeting with Davis. *Id.*

In July 2007, McNeil wrote one of many anonymous letters to Loyola's president to complain about racial discrimination, sex discrimination, and favoritism in DPS. *See id.* at 5. He accidentally left a copy of one of the letters in the copy machine, and Kelley found it and gave it to Fox. *See id.* McNeil met with Terrence Sawyer, HR's "Vice President of Administration" and Fox's supervisor, to discuss the letters. *Id.* at 5-6. McNeil told Sawyer that he felt Fox "had racial problems" and that McNeil was the "primary target." *Id.* at 5. Sawyer attempted to arrange a meeting between himself, McNeil, and Fox, but McNeil declined the meeting, believing it was "a ploy." *See id.*

In June 2009, DPS scheduled an exercise to simulate the presence of a gunman on campus. *See id.* at 6. On the morning of the exercise, McNeil "call[ed] out sick." *Id.* Fox told McNeil that he had to come to work for the exercise.[7] *Id.* Fox

---

[7] McNeil "had never heard of anyone else in the department being told to come in after calling out sick." ECF No. 9 at 3.

6

did not give McNeil instructions on that day about his
designated role in the exercise. *See id.* McNeil only knew that
he was supposed to send out a text message to the campus
community to alert it about the presence of a gunman. *See id.*
He mistakenly believed that the campus community had been
informed about the exercise. *See id.* McNeil sent the text
message, which resulted in panic on campus, because people
believed a gunman was actually present. *See id.* Because of
this admitted "mistake," McNeil was "effectively demoted" and
Kelley replaced Fox as McNeil's supervisor. *See id.*

In August 2011, there was an earthquake in Baltimore. *Id.*
at 6. The campus buildings were evacuated, but Kelley, without
authority, ordered DPS officers to allow people to return to the
buildings. *See id.* at 7. Kelley was told that this order was a
mistake, but she "didn't think that it was a big deal." *See id.*
The campus buildings were inspected after the earthquake and one
had "minor structural damage." *See id.* "To [McNeil's]
knowledge," Kelley was not "disciplined, penalized, nor demoted
for putting the campus community in harm's way in that
situation." *Id.*

During the years that Kelley supervised McNeil, he received
several poor performance reviews, asserting that he lacked
attention to detail and "urgency." *See id.* "She [was] the only
supervisor in [McNeil's] 36 years at [Loyola] that [had] made

7

such a comment about [him]." *Id.* She "criticized" most of
McNeil's work. *Id.*

McNeil "believe[d]" that he was "discriminated against by
[Kelley]," because she treated the other manager under her
supervision, Weber, "vastly differently." *See id.* at 7-8.
McNeil was required to "work base in case of a shortage" of
personnel, but Weber was "not allowed to work base" even after
Weber requested permission. *See id.* at 8. Weber was also given
access to technical systems in McNeil's "area of
responsibility." *See id.* McNeil had requested access and
training in these systems, but his requests were "ignored" by
Fox and Kelley. *Id.*

"From September 2011 through March 2012, Ms. Kelley issued
[McNeil] at least (10) disciplinary actions or documents, most
of which were simply hogwash" and contained "numerous mistakes."
ECF Nos. 1 at 7, 9 at 3. As a result of this accumulated
disciplinary action, on March 5, 2012, Kelley placed McNeil on
probation for 90 days.[8] ECF No. 9 at 4. Two days later, she
retracted McNeil's probation and instead issued him a written
warning. *Id.* McNeil believed Fox was encouraging Kelley to
keep "putting pressure" on McNeil. *See* ECF No. 1 at 7.

---

[8] McNeil did not have an opportunity to respond to Kelley's
charges until after she took disciplinary action against him.
ECF No. 1 at 7.

8

In March 2012, Loyola's president gave McNeil an award, because he had worked for Loyola for 35 years. *Id.* at 10. However, in 2012, "there was a timetable" to fire McNeil, because Kelley "was writing [McNeil] up for everything that [she] could [f]ind, even if it was not true."[9] *Id.* On May 1, 2012, Kelley placed McNeil on 60 days probation, because "she noticed that [his] radio inventory and log information was inaccurate [and] incomplete." ECF No. 9 at 5.

Also in May 2012, Kelley accused McNeil of losing a master key to the DPS office. *Id.* However, Kelley had never issued McNeil a master key. *Id.* Although Kelley showed McNeil a document which showed he had been issued the key, she had no "documentation where [McNeil] signed for such a key," which was "established procedure." *Id.*

On May 7, 2012, Fox called McNeil to his office and "went over the litany of charges issued by Ms. Kelley to [McNeil] for performance problems, including [that he had allegedly lost] the key to his building." *Id.* at 6. Fox told McNeil that "he was going to termination." *Id.* McNeil "had to decide whether to be fired or resign." ECF No. 1 at 10. McNeil chose to resign. *Id.* He was replaced by a white person. ECF No. 9 at 10.

---

[9] McNeil began to send documents to his Yahoo email account "for use in any future legal proceedings." ECF No. 1 at 10. McNeil believed his account was hacked, because these documents were deleted from his email. *See id.*

On February 7, 2013, McNeil filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). ECF No. 1 at 11. On February 20, 2013, McNeil received a right to sue letter. ECF No. 1-1. On May 20, 2013, McNeil filed a complaint against the defendants, alleging that they had discriminated against him on the basis of his race, in violation of Title VII, and his age, in violation of the ADEA.[10] ECF No. 1.

On July 19, 2013, the defendants moved to dismiss the complaint. ECF No. 5. On August 8, 2013, McNeil opposed the motion. ECF No. 9. On August 26, 2013, the defendants replied. ECF No. 10. On October 2, 2013, McNeil moved for leave to file a surreply. ECF No. 12. On October 4, 2013, the defendants opposed the motion. ECF No. 13.

II. Analysis

A. Legal Standard for Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."

---

[10] McNeil seeks back pay, $300,000 in damages, and an injunction to "restrain defendant from tampering with or removing any records relevant to this case." ECF No. 1 at 11-12.

10

*Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001). Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This requires that the plaintiff do more than "plead[] facts that are 'merely consistent with a defendant's liability;'" the facts pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 557). The complaint must not only allege but also "show" that the plaintiff is entitled to relief. *Id.* at 679 (internal quotation marks omitted). "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief." *Id.* (internal quotation marks and alteration omitted).

B. Claims Against Individual Defendants

The defendants assert that "Plaintiff's claims cannot stand against Mr. Fox or Ms. Kell[e]y,[11] as no individual liability exists under Title VII or the ADEA." ECF No. 5 at 1. McNeil contends that there is disagreement among courts "about individual supervisor liability." *See* ECF No. 9 at 7.

In the Fourth Circuit, there is no individual liability for violations of Title VII or the ADEA. *See Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 178 (4th Cir. 1998) (affirming grant of summary judgment to plaintiff's former supervisor on Title VII claims); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir. 1994) (ADEA) (*citing Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993) ("[It] is inconceivable that Congress intended to allow civil liability to run against individual employees.")). McNeil's claims against the individual defendants will be dismissed.[12]

---

[11] The parties spell this defendant's name differently--McNeil as "Kelley" and the defendants as "Kelly." *See* ECF Nos. 1 at 1, 5 at 1. Because the defendants have not requested to correct the spelling of her name on the docket, the Court will use the spelling used in the complaint, "Kelley."

[12] Although McNeil states in his opposition that Kelley's actions were "intentional infliction of emotional distress," ECF No. 9 at 3, the complaint does not assert this claim, *see, e.g.*, ECF No. 1 at 1-2. Because it is unclear whether McNeil intends to plead this claim in his opposition, or just make an additional statement of fact, the Court will not construe this statement as a standalone claim. *See Rush*, 2009 WL 4728971, at *3.

C. Race and Age Discrimination

    1. Timeliness

Loyola contends that "nearly all of [McNeil's] factual allegations . . . are untimely and must be dismissed," because they occurred more than 300 days before McNeil filed his EEOC charge. ECF No. 5-1 at 9. McNeil argues that the "discrimination" and "harassment . . . began years ago" and he "exhaust[ed] administrative remedies by reporting the discrimination" to Davis. *See* ECF No. 9 at 1.

To bring a Title VII or ADEA claim in federal court, a plaintiff must first exhaust his administrative remedies by filing a timely charge of discrimination with the EEOC. *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). There are two limitations periods within which the EEOC charge may be filed. "The basic limitations period is 180 days after the alleged unlawful employment practice." *Edelman v. Lynchburg College,* 228 F.3d 503, 506 (4th Cir. 2000) (*citing* 42 U.S.C. § 2000e-5 (e)(1)). In deferral states such as Maryland,[13] the period is extended to 300 days. *See Williams v. Giant Food, Inc.,* 370 F.3d 423, 428 (4th Cir. 2004); 42 U.S.C. § 2000e-5

_____

[13] Deferral states have "a State or local agency with authority to grant or seek relief from [unlawful employment] practice[s] or to institute criminal proceedings with respect thereto." 42 U.S.C. § 2000e-5 (e)(1). "The Baltimore Community Relations Commission . . . is one such local agency with authority over employment discrimination cases." *Borders v. Policy Studies, Inc.,* 2008 WL 3200725, at *4 (D. Md. Aug. 5, 2008).

(e)(1)); 29 U.S.C. § 626(d)(1). Thus, to be timely, McNeil's
EEOC charge must have been filed within 300 days of the alleged
unlawful employment practice.

McNeil alleges that the defendants committed several
discrete acts of discrimination against him from 2003 until his
resignation in 2012, including freezing his raises, removing him
as supervisor from certain shifts, demoting him, and refusing to
give him requested training. *See* ECF No. 9 at 1-4, 6-7, 9.
McNeil has not argued or shown that he is entitled to equitable
tolling of the charge limitations period; thus, the 300 days
limitations period applies to these allegations. *See Nat'l R.R.
Passenger Corp. v. Morgan*, 536 U.S. 101, 113-15, 122 S. Ct.
2061, 2072-73, 153 L. Ed. 2d 106 (2002). McNeil filed his EEOC
charge on February 7, 2013. ECF No. 1 at 11. Accordingly, all
claims arising out of the defendants' allegedly discriminatory
acts that occurred more than 300 days before the charge filing
date--April 13, 2012--are time-barred. McNeil makes only two
timely allegations of discriminatory acts--his placement on
probation on May 1, 2012 and his allegedly forced resignation on
May 7, 2012. *See* ECF No. 9 at 5-6.

2. Adverse Employment Actions

McNeil alleges that his placement on probation and forced
resignation resulted from discrimination on the basis of his age
and race. *See* ECF Nos. 1 at 2, 9 at 5-6. Title VII and the

14

ADEA prohibit employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to . . . privileges of employment, because of such individual's" age or race. 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)(1). To state a claim of race or age discrimination under these sections, McNeil must allege that he suffered an adverse employment action. *See Ali v. Alamo Rent-A-Car, Inc.*, 8 F. App'x 156, 157-58 (4th Cir. 2001); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1254-55 (4th Cir. 1985) ("The law affords no protection from discrimination unless there has been some adverse employment action by the employer.").

a. Placement on Probation

The defendants contend that "a mere allegation of being placed on probation does not constitute an adverse employment action" for purposes of establishing a discrimination claim. *See* ECF No. 10 at 3.

To state a *prima facie* claim of race or age discrimination, McNeil must allege facts showing: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *see White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).

i. Satisfactory Job Performance

In determining whether McNeil had satisfactory job
performance, "it is the employer's perception that matters, not
the employee's self-assessment." *Martin v. Scott &
Stringfellow, Inc.*, 643 F. Supp. 2d 770, 782 (E.D. Va. 2009)
*aff'd,* 352 F. App'x 778 (4th Cir. 2009) (*citing King v.
Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003)). McNeil has not
alleged that he was satisfactorily performing his job, in
Loyola's opinion. Although he alleges that "most" of Kelley's
disciplinary actions against him were "hogwash," he acknowledges
that not all of these actions inaccurately described his
performance and at least some were legitimate. *See* ECF Nos. 1
at 7, 9 at 3, 10. McNeil also acknowledges that Kelley gave him
several negative performance evaluations, citing his need for
greater attention to detail and urgency in performing his job.
ECF No. 1 at 7. He also does not dispute that he was placed on
probation before his forced resignation because of problems with
his inventory reports and log information. *See* ECF No. 9 at 5.
Finally, he acknowledges that Fox demoted him because of his
serious mistake in sending a text message falsely informing the
campus community that a gunman was present. *See* ECF No. 1 at 6.
Thus, McNeil has failed to allege he had satisfactory job
performance when he was placed on probation.

### ii. Adverse Employment Action

An adverse employment action is one which adversely affects the terms, conditions, or benefits of the plaintiff's employment. *See Munday v. Waste Management of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997), *cert. denied*, 522 U.S. 1116 (1998). The "typical requirements for a showing of an 'adverse employment action'" are allegations of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

McNeil does not allege that his placement on probation caused any negative consequences, such as demotion, denial of promotion opportunities or leave, or reduction of salary. *See Murphy v. Danzig*, 64 F. Supp. 2d 519, 522-23 (E.D.N.C. 1999); *Cornelius v. City of Columbia*, 663 F. Supp. 2d 471, 476-77 (D.S.C. 2009) *aff'd sub nom. Cornelius v. Columbia, City of, S. Carolina*, 399 F. App'x 853 (4th Cir. 2010) (placement on probation following negative performance review was not an adverse employment action, because plaintiff "failed to establish that [it] affected the terms, benefits or conditions of his employment"). Although McNeil was allegedly forced to resign shortly after he was placed on probation, *see* ECF No. 9 at 5-6, he does not allege that his resignation occurred because

of his probationary status.[14]   Thus, McNeil has not alleged

sufficient facts to show that his placement on probation was an

"adverse employment action."   Accordingly, McNeil's placement

on probation on May 1, 2012 cannot support a discrimination

claim under Title VII or the ADEA.

### b. Forced Resignation

McNeil does not allege that the defendants terminated his

employment, but he alleges that the defendants forced him to

resign.  *See* ECF No. 9 at 6.  The defendants contend that,

because McNeil "has not stated any cause of action for race or

age discrimination, his constr[u]ctive discharge claim must

fail."  ECF No. 5-1 at 7-8.

"'[C]onstructive discharge' allows a plaintiff to satisfy

the 'tangible [adverse] employment action' element when

conditions of employment become intolerable, *even though the

employer takes no action.*"  *Marlow v. Chesterfield Cnty. Sch.

Bd.*, 749 F. Supp. 2d 417, 429 (E.D. Va. 2010) (emphasis in

original) (*quoting Whitten v. Fred's, Inc.,* 601 F.3d 231, 248

(4th Cir. 2010)).  Constructive discharge occurs when an

employee resigns because the "employer deliberately makes the

working conditions intolerable in an effort to induce the

---

[14] McNeil alleges that Fox told him that he "was going to
termination," because of Kelley's "charges [of] performance
problems, including [that he] allegedly [lost] the key to his
building."  *See* ECF No. 9 at 6.

18

employee to quit." *Honor v. Booz-Allen & Hamilton, Inc.,* 383 F.3d 180, 186-87 (4th Cir. 2004) (internal quotations omitted). To state a claim of constructive discharge, McNeil must allege: (1) the defendants' intentional actions were motivated by age or race bias; and (2) McNeil's working conditions were objectively intolerable. *Alba v. Merrill Lynch & Co.,* 198 F. App'x 288, 294 (4th Cir. 2006); *Reed v. Airtran Airways,* 531 F. Supp. 2d 660, 667 (D. Md. 2008).

i. Racially-Based Constructive Discharge

To state a *prima facie* case of racially motivated constructive discharge, McNeil must allege: (1) he "is a member of a protected class;" (2) he "was qualified for the job and performed the job satisfactorily;" (3) he was constructively discharged; and (4) "the position remained open to similarly qualified applicants after [McNeil's] dismissal." *See Carter v. Ball,* 33 F.3d 450, 458-59 (4th Cir. 1994).

For the reasons discussed above, McNeil has failed to allege that he was performing his job satisfactorily. *See supra* Section II.C.2.a.i.

Also, although McNeil complains about several actions and decisions made by Fox and Kelley, he does not allege facts showing objectively intolerable working conditions. He alleges that his supervisory authority was removed and undermined in some cases, that he had to perform duties which should have been

19

performed by others, that he was unfairly disciplined and criticized, that he was once slapped on the back by Fox, and that Fox froze his salary. *See, e.g.*, ECF Nos. 1 at 3-5, 7-8; 9 at 1, 3. However, "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Williams*, 370 F.3d at 434 (*quoting Carter*, 33 F.3d at 459) (denying constructive discharge claim because plaintiff's allegations that "supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back" did not establish objectively intolerable working conditions). Also, that Fox told McNeil that he would be terminated is insufficient to establish objectively intolerable working conditions to support a constructive discharge claim. *See Alba*, 198 F. App'x at 294 (denying constructive discharge claim even though defendants put substantial pressure on plaintiff to retire) (*citing Honor*, 383 F.3d at 183-87 (denying constructive discharge claim after plaintiff was told he would be fired)).

Because McNeil has failed to allege objectively intolerable working conditions and satisfactory job performance, he has failed to state a claim of constructive discharge motivated by racial bias.

ii. Age-Based Constructive Discharge

To state a *prima facie* claim of constructive discharge
motivated by age bias, McNeil must allege: "(1) he was
constructively discharged; (2) he was at least 40 years old at
that time; (3) he was performing his job duties at a level that
met [Loyola's] legitimate expectations at the time of his
constructive discharge; and (4) he was treated more harshly than
other similarly situated younger employees." *Alba*, 198 F. App'x
at 294 (*citing Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
354 F.3d 277, 285 (4th Cir. 2004)).

For the reasons discussed above, McNeil has failed to show
that he was constructively discharged or was meeting Loyola's
legitimate expectations. *See supra* Section II.C.2.b. McNeil's
constructive discharge claims will be dismissed.

D. Hostile Work Environment

The defendants assert that McNeil has not alleged facts
"showing an abusive or threatening environment" or "regarding
any comments or conduct allegedly based on Plaintiff's age or
race." ECF No. 5-1 at 12-13. McNeil contends that "[t]he
torrent of disciplinary action taken by Ms. Kelley against
Plaintiff in such a short period of time" caused him much stress
and "is proof of an extremely hostile environment." ECF No. 9
at 9.

To state a hostile work environment claim,[15] McNeil must allege facts showing that the offending conduct was: (1) unwelcome; (2) based on race or age; (3) subjectively and objectively severe or pervasive enough to alter the plaintiff's conditions of employment and create an abusive atmosphere; and (4) imputable to the employer. *See Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183-84 (4th Cir. 2001); *Baqir,* 434 F.3d at 745-46; *Alston v. N. Carolina A & T State Univ.*, 304 F. Supp. 2d 774, 779 (M.D.N.C. 2004). An employee's complaint about the offending conduct indicates that he found it unwelcome. *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008). To establish that the conduct was based on age or race, McNeil must show that "but for" his age or race, he "would not have been the victim of the alleged discrimination." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 772 (4th Cir. 1997). Race-based or age-based animosity can be shown by direct evidence of discrimination, or differential treatment of similarly situated

---

[15] A plaintiff may plead a hostile work environment claim under the ADEA and Title VII. *See, e.g.*, *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009); *Baqir v. Principi,* 434 F.3d 733, 746 n.14 (4th Cir. 2006) (noting that hostile work environment claims are cognizable under Title VII and assuming, without deciding, that a plaintiff aged 40 or older may bring a hostile work environment claim under the ADEA); *see also Graham v. Prince George's County,* 191 Fed. App'x. 202, 204 (4th Cir. 2006) (deciding the merits of an ADEA hostile work environment claim).

younger or white employees.  *See Gilliam v. S. Carolina Dep't Of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007); *Causey*, 162 F.3d at 801-02.

In determining whether the offending conduct was sufficiently severe or pervasive to alter the plaintiff's employment conditions and create an abusive environment, the Court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sunbelt Rentals*, 521 F.3d at 315.  McNeil must "clear a high bar" to satisfy this standard--he must show more than simple teasing, offhand remarks, and isolated incidents (unless "extremely serious").  *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L.Ed.2d 662 (1998); *Sunbelt Rentals*, 521 F.3d at 315.

1. Age-Based Hostile Work Environment

With the exception of Fox's "occasional" inquiries about McNeil's age and retirement plans, McNeil makes no other allegations connecting the defendants' conduct to his age.[16]

---

[16] McNeil has sufficiently alleged that he was over the age of 40 when the events in the complaint occurred, and thus was within the ADEA's protected class.  *See* ECF No. 1 at 1; *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S. Ct. 1307, 1310, 134 L. Ed. 2d 433 (1996).  However, he has not alleged

23

Fox's age-related comments are insufficiently severe or pervasive to establish a hostile work environment, given their admitted infrequency and "mild nature." *See Burns v. AAF-McQuay, Inc.*, 166 F.3d 292, 295 (4th Cir. 1999) (denying hostile work environment claim when plaintiff's supervisor asked her about her retirement plans, said plaintiff acted like a child, and said plaintiff did not fit in with the group); *cf. Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) (finding no direct evidence of age discrimination when supervisor asked plaintiff about his retirement plans, because "a company has a legitimate interest in learning its employees' plans for the future"). Accordingly, McNeil has failed to state a hostile work environment claim on the basis of age.

2. Race-Based Hostile Work Environment

McNeil has not alleged that any Loyola employee made racially-based comments or took any of the actions about which he complains[17] because of his race. He alleges that Fox took

———————————————————————————

that any similarly situated employee was outside the ADEA's protected class.

[17] Although many of the acts about which McNeil complains occurred outside the 300 day filing period, the continuing violation theory applies to hostile work environment claims which are "composed of a series of separate acts that collectively constitute one unlawful employment practice" and are timely if "an[y] act contributing to the claim occur[red] within the filing period." *Morgan,* 536 U.S. at 117 ("It does not matter . . . that some of the component acts of the [claim] fall outside the statutory time period."). Because McNeil

24

several actions which undermined or removed his supervisory authority, including Fox's refusal to allow McNeil to continue to supervise all shifts or to discipline McNeil's reports when they would not cooperate with McNeil as instructed. *See* ECF No. 1 at 3, 9. He also alleges that Fox once slapped him on the back. ECF No. 9 at 1. However, he does not allege that Fox took these actions because of McNeil's race or that Fox treated him differently from similarly situated white employees. Similarly, McNeil does not allege that Kelley disciplined him excessively, or criticized his work, because of his race or did not discipline or criticize white employees for similar conduct. *See* ECF Nos. 1 at 7, 9 at 3. Thus, these actions cannot support McNeil's hostile work environment claim, because he has not alleged that they were based on his race.[18]  *See, e.g.*, *Gilliam*,

---

alleges that some unfair discipline by his supervisor occurred after April 13, 2012, *see* ECF No. 9 at 5-6, the continuing violation doctrine applies and the Court may consider all of McNeil's allegations of harassing conduct by the defendants. *See Lewis v. Norfolk S. Corp.*, 271 F. Supp. 2d 807, 812 (E.D. Va. 2003) ("If one act in a continuous history of discriminatory conduct falls within the charge filing period, then acts that are plausibly or sufficiently related to that act, which fall outside the filing period, may be considered for purposes of liability."); *see also, e.g.*, *Gilliam*, 474 F.3d at 141 (concluding that the continuing violation doctrine applied to supervisor reprimands outside the charge filing period, because plaintiff made allegations of similar reprimands occurring within the filing period).

[18] Even if McNeil could show that these actions were based on race, he likely could not show that they were sufficiently severe or pervasive to state a hostile work environment claim.

474 F.3d at 143 ("[E]ven if [defendant employer] disliked [plaintiff] and made her job more stressful as a result, that fact, absent some independent evidence of racial animosity, is not sufficient to establish a prima facie claim" of hostile work environment.).

In other allegations, however, McNeil contrasts his treatment with that of similarly situated white Loyola employees. He asserts that he was disciplined severely by Fox for his mistake in sending the text message about the gunman, which caused a panic on campus. *See* ECF No. 1 at 6. However, Kelley, a white woman, was not disciplined by Fox when she allegedly endangered the campus community by allowing people to return to campus buildings after the earthquake. *See id.* at 6-7. McNeil also alleges that Weber, another white manager supervised by Kelley, received training that McNeil was denied access to and, unlike McNeil, was not required to "work base" if there was a personnel shortage. *See id.* at 8. He also alleges that Fox froze his salary so that at least one less tenured

---

Although McNeil found Fox's and Kelley's actions upsetting and stressful, "[w]orkplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life." *Sunbelt Rentals*, 521 F.3d at 315; *cf. Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) ("It is for [the employer], not the courts, to rule on the wisdom and generosity of [a supervisor's] management practices.").

white manager could achieve parity in compensation with McNeil.
*See id.* at 4-5. These specific allegations of differential
treatment of similarly situated employees outside the protected
class are sufficient for the Court to infer that these actions
were based on McNeil's race. *See Gilliam*, 474 F.3d at 142-43.

However, the differential treatment alleged is
insufficiently severe or pervasive to state a hostile work
environment claim. McNeil alleges that, because of
discrimination, he was denied a training opportunity, he did not
receive pay raises, and that he had to perform some extra
duties. These mere "workplace disputes" and displeasure with
specific managerial decisions, which took place over nine years,
do not describe "the type of severe or pervasive [race] based
activity necessary to state a hostile work environment claim."
*See Bass*, 324 F.3d at 765 (denying hostile work environment
claim because "the facts [alleged] merely tell a story of a
workplace dispute regarding [plaintiff's] reassignment and some
perhaps callous behavior by her superiors"); *Mangum v. Town of
Holly Springs*, 551 F. Supp. 2d 439, 444 (E.D.N.C. 2008)
(although plaintiff's work environment was "unpleasant," her
"complaints about defendant's failure to investigate her
complaints, discipline male firefighters, provide training, and
provide plaintiff [with] proper equipment [did] not rise to the

level of an objectively hostile work environment").[19]  Similarly,

McNeil's treatment following his admittedly "disastrous" mistake

in sending the text message, *see* ECF No. 9 at 2, is not "severe

or pervasive" discriminatory conduct.  McNeil does not allege

that he was fired or placed on probation, or that his salary was

reduced after the incident; only that he was demoted.  *See* ECF

No. 1 at 6.  He also does not allege "pervasive" discrimination

in discipline for serious misconduct, only this "isolated

incident."  *Faragher*, 524 U.S. at 788.  Thus, even if some of

these "sporadic" instances of differential treatment "might seem

suspicious," they were insufficiently severe or pervasive to

establish an abusive environment.  *See Jackson v. State of*

*Maryland*, 171 F. Supp. 2d 532, 542 (D. Md. 2001) (denying

hostile work environment claim when plaintiff alleged several

"suspicious" incidents occurring "sporadically over a long

period of time" of differential treatment of her and similarly

situated employees outside the protected class).  McNeil's

hostile work environment claims will be dismissed.

---

[19] *See also Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853,
864 (D. Md. 2004) (causing "'sporadic' inconvenience" to
plaintiff's ability to do her job "is not sufficiently 'severe
or pervasive' to meet the demanding test to establish a hostile
environment claim").

E. Surreply

McNeil seeks leave to file a surreply. ECF No. 12. The defendants assert that leave should be denied, because their reply "did not present any new matters." ECF No. 13 at 2.

Unless otherwise ordered by the Court, a party may not file a surreply. Local Rule 105.2(a) (D. Md. 2011). "Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve,* 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd,* 85 Fed. App'x 960 (4th Cir. 2004).

The defendants' reply memorandum does not raise any new arguments--it merely responds to the arguments raised in McNeil's opposition. *See* ECF No. 10. Accordingly, McNeil's proposed surreply does not respond to matters he would otherwise be unable to contest. *See Khoury*, 268 F. Supp. 2d at 605 (denying leave to file a surreply when reply brief "respon[ded] to a matter first introduced by Plaintiff" in her opposition). Also, McNeil has not argued or shown that the new facts and evidence he presents in his proposed surreply were unavailable when he opposed the motion to dismiss. *See F.D.I.C. v. Cashion*, 1:11CV72, 2012 WL 1098619, at *3 (W.D.N.C. Apr. 2, 2012) *aff'd,* 720 F.3d 169 (4th Cir. 2013). McNeil's motion will be denied.

III. Conclusion

For the reasons stated above, the defendants' motion to dismiss will be granted, and the plaintiff's motion for leave to file a surreply will be denied.

1/24/14

Date

William D. Quarles, Jr.
United States District Judge